**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **BARBARA THOMPSON,** | § | |
| **INDIVIDUALLY, YAJAIRA CULLUM AS** | § | |
| **NEXT FRIEND FOR NV T. AND NY T.,** | § | |
| **LISA MCCONNELL AS** | § | |
| **REPRESENTATIVE OF THE ESTATE** | § | **CIVIL ACTION NO.** |
| **OF MICHAEL THOMPSON,** | § | **3:24-cv-00276-KC** |
| *PLAINTIFFS,* | § | |
| | § | **Jury demanded** |
| **V.** | § | |
| | § | |
| | § | |
| **CITY OF EL PASO, CITY OF EL PASO** | § | |
| **POLICE DEPARTMENT, FIRE** | § | |
| **DEPARTMENT, , JESUS COBOS,** | § | |
| **DOMINIC GUERRERO, THOMAS** | § | |
| **SNEED, JOHN SPENCER, MICHAEL** | § | |
| **ARIAS, JACQUELINE AGUILERA,** | § | |
| **ALONZO MARTINEZ, KYLE K.** | § | |
| **BONATH, AND WALMART,** | § | |
| *DEFENDANTS,* | § | |
| | § | |
| | § | |

**<u>FIRST AMENDED COMPLAINT</u>**

**TO THE HONORABLE JUDGE HON. KATHLEEN CARDONE:**

    Plaintiffs, Barbara Thompson, Lisa McConnell as representative of the Estate of Michael

Charles Thompson, and Yajaira Cullum as Next Friend for NV T., and NY T.(minors) ("Plaintiffs"

herein) file this their First Amended Complaint against Defendants, The City of El Paso, (based on

actions by its Fire and Police Departments), Officer Dominic Guerrero, Thomas Sneed, John

Spencer, Michael Arias, Alonzo Martinez, Sgt. Jacqueline Aguilera, Texas Tech El Paso Police

Department, Chief Kyle K. Bonath, Jesus Cobos (collectively "Law Enforcement Defendants"

1

"Defendants"), and Medical personnel assigned to City of El Paso Fire Department Pumper 12[1], Axon Enterprises[2] and Walmart, Inc. (Walmart Stores Texas) in support thereof show as follows:

## I. PARTIES

1.      Plaintiff Barbara Thompson, individually and with Yajaira Cullum as Next Friend for NVT, and NYT, Lisa McConnell as Representative of the Estate of Michael Thompson, is an individual residing in El Paso, Texas.

2.      Defendant, El Paso Police Department, is a municipal corporation located in the State of Texas, is incorporated under the laws of the State of Texas, and is located within the boundaries of El Paso County. It has been served with citation and answered.

3.      Defendant, Officer Guerrero, is an individual who was served with a citation by certified mail 9214890142980407032834 at 8:44 am on September 6, 2024. He has failed to answer, default judgment is pending.

4.      Officer Guerrero is being sued in his individual capacity and at all times relevant to this case acted under the color of state law.

5.      Defendant, Officer Thomas Sneed is an individual who may be served with a citation at his place of employment, El Paso Police Department, 911 N Raynor St, El Paso, TX 79903, or wherever he may be found. Officer Thomas Sneed is being sued in his individual capacity and at all times relevant to this case acted under the color of state law.

6.      Defendant, Officer John Spencer, is an individual who may be served with a citation at his place of employment, El Paso Police Department, 911 N Raynor St, El Paso, TX 79903, or wherever

---

[1] REDACTED AND COPY FILED UNDER SEAL

████████████████████████████████████████████████████████

[2]

he may be found. Officer John Spencer is being sued in his individual capacity and at all times relevant to this case acted under the color of state law.

7.     Defendant, Officer Michael Arias an individual who has been served by certified mail 9214890142980407126403 on September 9, 2024. He has failed to answer, default judgment is pending.

8.     Officer Michael Arias is being sued in his individual capacity and at all times relevant to this case acted under the color of state law.

9.     Defendant, Alonzo Martinez is an individual who may be served with a citation at his place of employment, El Paso Police Department, 911 N Raynor St, El Paso, TX 79903, or wherever he may be found. Officer Alonzo Martinez is being sued in his individual capacity and at all times relevant to this case acted under the color of state law.

10.     Defendant, Sgt. Jacqueline Aguilera is an individual who has been served with a citation. Sgt. Jacqueline Aguilera is being sued in her individual capacity and at all times relevant to this case acted under the color of state law.

11.     Defendant, Officer Jesus Cobos is an individual who may be served with a citation at his place of employment 701 West 5th Odessa, TX, or wherever he may be found. Officer Jesus Cobos is being sued in his individual capacity and at all times relevant to this case acted under the color of state law.

12.     Defendant, Kyle K. Bonath is an individual who may be served with a citation at his place of employment, 413 Flint Avenue Lubbock, Texas 79415, or wherever he may be found. Officer Kyle K. Bonath is being sued in his individual capacity and at all times relevant to this case acted under the color of state law.

13.     Walmart, Inc., (Wal-Mart Stores Texas, LLC and Walmart Associates, Inc.) was served through its registered agent CT Corp. at 350 N. Saint Paul Street, Dallas Texas by the El Paso District clerk and not a private process server on July 29, 2024.

14.     Medical personnel assigned to City of El Paso Fire Department Pumper 12[3]

## **INTRODUCTION**

15.     "You look like a thug, and you're going to kill me."...Mr. Michael Thompson, a United States Army Veteran, told Officer Dominic Guerrero, "You are going to kill me," prior to the incident that resulted in his death at the hands of El Paso Officers Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, Sgt. Jacqueline Aguilera, Texas Tech El Paso Police Department Officer and Walmart employee Jesus Cobos, and City of El Paso Fire Department Pumper 12 medical personnel on the scene who denied care.

16.     He was the father of two young daughters, NT and NT, and son of Barbara Thompson, and Lisa McConnell, his stepmother.

17.     He suffered from mental illness brought on by his service in the military while overseas.

18.     After being discharged from the military he suffered from mental distress like many of his counterparts, specifically post-traumatic stress disorder (PTSD).

19.     He experienced bouts of homelessness sleeping at the homes of different friends and family members until he found a stable place to live and was able to rent his apartment.

20.     On the date of his death, he was walking on a public street headed in the direction of 7-Eleven.

---

[3] REDACTED AND COPY FILED UNDER SEAL

21.     The 7-Eleven is located at 5830 Dyer Street, just north of Fred Wilson, around 12:50 a.m..



22.     En route, he passed the Texas Tech off-duty officer, Cobbs, who was working for Walmart on an off-duty job.

23.     Cobos chose to stalk Mr. Thompson while he was on duty working for Walmart making him feel paranoid following him in his car.

24.     Since the Walmart employee Cobos was off duty with the Texas Tech Police Department, he did not wear a body-worn camera.

25.     As experiencing a mental health episode, he recognized the need to call first responders to help him with the medical mental distress he was suffering.

26.     Mr. Thompson's paranoia increased, triggering his mental distress. Upon arriving at 7-Eleven, Mr. Thompson requested the 7-Eleven clerk call for assistance from 911.

27.     The clerk also recognized Mr. Thompson was in mental distress and appeared to be experiencing visual and auditory hallucinations. The clerk called 911 and requested assistance.

28.     El Paso Police Department patrol officer Guerrero arrived in response to the call.

29.     He remained in the same mental state but also that he was in danger.

30.     Officer Guerrero never addressed his serious medical and mental health needs.

31.     Mr. Thompson assessed Officer Guerrero and determined that his objective would be to kill him.

32.     According to Officer Guerrero, Mr Thompson told him about his fear…"You are going to kill me."

33.     Guerrero went on to restrain Mr. Thompson. He took Mr. Thompson to the ground in the 7-Eleven parking lot. Guerrero held Mr. Thompson in the prone position on his stomach with his full body weight on Mr. Thompson's back.

34.     Officer John Spencer arrived on the scene and immediately helped Guerrero in holding Mr. Thompson facedown on the ground.

35.     Officer Sneed arrived and joined in not to intervene but to commence using a Taser against Mr. Thompson.

36.     The Walmart employee and Texas Tech Officer Cobbs joined the other officers instead of intervening to stop the unlawful use of force, based on his lack of training by Chief Kyle K. Bonath.

37.     He was unsupervised by Texas Tech or Walmart, his employer at the time of the incident.

38.     Officer Cobos restrained Mr. Thompson while he and the other officers engaged in the unlawful strangulation, choking, beating, and striking of Mr. Thompson.

39.     While in the back of the squad car, it was confirmed that Mr. Thompson stopped breathing.

40.     The officers involved received no injuries.

41.      Although Mr Thompson had not committed any crime, the officers were unaware of any warrants he could have possibly had and had not engaged in any physical attack against any officers, Mr. Thompson was subjected to strangulation by choking and physical assault.

42.     Subsequently, Mr. Thompson's body went limp in response to officers Guerrero, Sneed, Aris, Martinez, Spencer, and Cobos placed in the rear of a patrol unit in his stomach face down without regard to whether it would further injure Mr. Thompson.

43.     Sgt. Aguilera watched but did nothing.

44.     The officers were able to view Mr. Thompson's back and see if it was moving from breathing or not.

45.     It was not, but Officer Spencer and Sneed continued to administer taser shocks at least four additional times.

46.     Mr. Thompson remained limp.

47.      He was not resisting and in medical distress.

48.     Sgt. Aguilera failed to intervene to stop the officer's actions.

49.     She ordered Narcan to be administered without accessing Mr. Thompson personally.

50.     She commanded Narcan be administered due to her lack of training to defer to the medical personnel on the scene, how to recognize opioid overdose or understand the purpose of the use of the opioid overdose medication.

51.     The electric shock by Spencer was achieved through drive-stunning, which involved pressing the front of the Axon taser weapon firmly against Mr. Thompson's body to deliver direct electric shocks.

52.     Axon Taser is marketed as a "less than lethal" force weapon, but this is only proper training on the use otherwise it could result in death or serious injury.

53.     EPPD did not provide Spencer or Sneed training on the proper use of the less-than-lethal taser weapon.

54.     The El Paso Fire Department ("EPFD") delayed medical care for Michael Thompson 25 minutes elapsed between the time EMS arrived at 1:11 am and 1:36 am before getting him to the hospital, six miles, an 11-minute drive away in normal traffic during the day.



55.    He died as a result of the EPPD officers' unreasonable use of force, and EPPD's failure to train its officers on the appropriate use of force.

56.    Michael Thompson's death was ruled a homicide by two pathologists, Dr. Cavalliery, and Dr. Matthias I. Okoye, M.D..

57.    Mr. Thompson left behind two minor daughters, sole heirs, and parents, Barbara Thompson and Lisa McConnell, his stepmother who continue to mourn his death.

### III. JURISDICTION AND VENUE

58.    Jurisdiction is proper in this Court because

59.    Plaintiffs seek monetary relief over $50,000,000.00 including damages of any kind, penalties, costs, expenses, pre-judgment interest, attorneys' fees, and all other relief to which the Plaintiffs

deem themselves entitled from each defendant jointly and severally pursuant to 42 USC 1983, 1985 and 42 USC 1988.

60.     The venue is proper in El Paso County, Texas, because all or a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in El Paso County, in the Western District of Texas

<u>IV. ADDITIONAL FACTS</u>

61.     This suit arises from the excessive use of force, wrongful arrest, detention, and denial of medical care by El Paso Fire Department paramedics ████████ assigned to Pumper 12 at midnight on June 27, 2022, and Officers Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos against 36-year-old Army Veteran Michael Thompson.



62.     On June 27, 2022, the El Paso Police Department Patrol Officers responded to 5830 Dyer at a 7-Eleven convenience store in El Paso, Texas in reference to a welfare check, at Mr. Thompson's request.

63.     Mr. Thompson requested the 7-Eleven clerk assist him by calling for emergency services through 911. The City of El Paso Police Officer Guerrero arrived instead of medical personnel.

64.    The officers immediately determined that Mr. Thompson should be detained instead of providing medical attention or calling the appropriate CRIT team members.

65.    It is undisputed that Mr. Thompson had not committed any crime on the night in question or that was not armed or a fleeing suspect.

66.    The officers were unaware of Mr. Thompson being anything more than an innocent person in need of mental health care.

67.    He objected to the unlawful detainment and consented only to medical assistance.

68.    Both EPPD Officers and EPFD EMS paramedic personnel ignored Mr. Thompson's serious medical needs and continued to attempt to restrain him and withhold medical care.

69.    The officers escalated the contact and tased Mr. Thompson.

70.    El Paso Police officers Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, Jesus Cobos, and Sgt Aguilera each chose not to attempt to utilize any de-escalation methods in the situation based on the lack of supervision, training, and discipline of officers in the EPPD by City of El Paso chief of police and the City of El Paso.

71.    Instead, they detained Michael Thompson without knowledge that there was a warrant for his arrest or not.

72.    The officers restrained him with handcuffs and placed him in the backseat of a patrol unit.

73.    While in custody, they tasered, choked, and struck him until he became unresponsive although they had the opportunity to consider or take other more appropriate measures short and prior to the use of force.

74.    His body was left battered with bruising, cuts, and scraps.

75.    After officers placed Mr. Thompson in the back of the patrol vehicle, FMS and Sgt. Aguilera peered on, the officers stated that they recognized that Mr. Thompson stopped breathing.

76.    Mr. Thompson never received the mental medical assistance that he requested.

77.    He did not receive any medical care for his injuries while on the scene after he was beaten by Guerrero, Sneed, Spencer, Arias, Martinez, and Cobos and tased by Spencer and Sneed, other than the wrongful administration of Narcan after Mr. Thompson went into cardiac arrest from the beating and tasing, despite Mr. Thompson not being unresponsive due to an opioid overdose, causing a delay in necessary CPR.

78.    The delay in medical care was based on the Narcan being administered at the order of Sergeant Jacqueline Aguilera.

### *Aguilera*

79.    Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

80.    Sgt. Aguilera arrived to supervise due to the initial Taser deployment and observed multiple officers dealing with Mr. Thompson.

81.    He was in handcuffs and bent over the hood of a patrol unit as he was still alive and had not gone limp.

82.    She witnessed Mr. Thompson moving his body from side to side, yelling and screaming when she arrived.

83.    Sgt. Aguilera supervised as officers placed Mr. Thompson in the backseat of a patrol unit.

84.    She observed that he was limp and not responding. She witnessed that he was unable to walk or obey commands, officers placed him face down in the back seat, and he remained unresponsive to commands to sit up but did nothing to address his serious medical need.

85.    Aguilera recognized his serious medical needs because she inquired if Thompson was unresponsive due to his mental state or a medical issue, both serious medical needs.

86.    She never requested her officers to allow FMS personnel to intervene to address his serious medical needs.

87.    Eventually, her officers, Sneed and Spencer checked his eyes and confirmed the obvious that

he was unresponsive.

88.     Aguilera requested Narcan.

89.     These actions were either intentionally and deliberately wrong or due to a lack of training by the El Paso Police Department.

90.     Aguilera informed the on-call CAP and IAD supervisors and provided details to the Public Information Officer (PIO).

91.     She instructed officers to treat the area as a crime scene, set up a perimeter, and completed an evidence voucher and chain of evidence form for the spent Taser cartridge.

92.     Sgt. Aguilera claimed Mr. Thompson's behavior was combative because he yelled, screamed, and moved from side to side as her officers attempted to subdue him.

### *Arias*

93.     Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

94.     Michael F. Arias started his tenure as a full-time peace officer El Paso Police Department on March 9, 2020.

95.     Officer Michael Arias arrived on the scene and despite the non-threatening nature of his interaction with Mr. Thompson immediately jumped in to restrain him, by placing his left knee over Thompson's knee and thigh area to hold him down, and began to strike him.

96.     He held Thompson's head down with his left hand and placed his right forearm across Thompson's shoulder blades obstructing Thompson's breathing and causing physical pain.

97.     He physically restrained Mr. Thompson, who he knew was agitated with medical issues.

98.     He went on to interfere with FMS's medical evaluation and treatment by continuing to hold Thompson down while FMS personnel were removing the Taser prongs and checking Thompson's

vitals.

99.     Arias exacerbated any underlying medical conditions or injuries Thompson might have had delaying medical care. Arias assisted in carrying Thompson to the patrol vehicle when Thompson was no longer breathing and limp instead of allowing FMS intervention.

100.     The combination of physical restraint, and placing him in the squadcar contributed to Thompson's deteriorating condition, since he was already experiencing medical distress due to the choking, tasering, and agitations.

### *Martinez*

101.     Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

102.     Officer Alonzo Martinez's treatment of Michael Thompson struck and restrained Mr. Thompson. He helped in getting Thompson out of the patrol unit when Thompson was non-responsive but provided no medical care.

103.     Martinez took photos of Thompson still actively in distress and failed to intervene to stop the other officers' actions, provide medical care, or allow FMS to begin treatment which delayed or complicated the medical evaluation.

104.     The combination of his physical restraint, handling Mr. Thompson while moving him, and the delay in treatment, as he searched for weapons on a non-responsive subject, contributed to Thompson's deteriorating condition while he was experiencing medical distress due to the actions of the other officers.

105.     He had inadequate training in the proper methods to restrain and handle individuals in custody exhibiting signs of medical distress or altered mental states.

### Guerrero

106.    Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

107.    Dominic Guerrero peace officer El Paso Police Department peace officer licensed January 22, 2019, 5 years, 5 months

108.    Officer Guerrero initiated a physical struggle with Thompson, which involved wrapping his arms around Thompson and dropping both of them to the ground causing him physical harm. Guerrero had no basis to detain and struggle with Mr. Thompson. The struggle caused multiple officers to join in and introduced the use of the high level of force used against him. He was tased by Spencer.

109.    After the taser deployment, Guerrero and other officers placed Thompson in a patrol unit.

110.    Guerrero did not call out over the radio to inform other officers of Mr. Thompson's mental health status, and that he was not under arrest but in need of a medical evaluation. This without question delayed and denied the appropriate response and coordination of proper support.

111.    Guerrero claimed Mr. Thompson was passively resisting when he became limp, which delayed the recognition of Thompson's medical distress.

112.    This misjudgment delayed critical medical intervention.

113.    Guerrero was involved in the decision to transport Thompson under an Emergency Detention Order (EDO) and to work up a warrant for resisting arrest. His poor training and decision-making diverted attention from Thompson's immediate medical needs.

114.    Guerrero initiated a physical struggle with Thompson, which involved wrapping his arms around Thompson and dropping both of them to the ground.

### John T. Spencer

115.    Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

116.    John T. Spencer peace officer El Paso Police Department peace officer license April 13,

2007, May 20, 2024, 17 years, 1 month.

117.    Officer Spencer was involved in the physical struggle with Michael Charles Thompson while he was being detained.

118.    Officer Spencer was part of the decision to deploy a taser on Thompson during the encounter. Officer Spencer, along with other officers, struck and restrained Thompson.

Officer Spencer watched when Thompson was ultimately handcuffed, although Mr. Thompson continued to exhibit distress. Officer Spencer was on the scene when Thompson became unresponsive after being placed in the patrol unit. Officer Spencer was among the officers who did nothing for emergency medical needs after Thompson was found unresponsive. He tased and caused the agitated Mr. Thompson to go into cardiac arrest based on his repeated tasing of Mr. Thompson. He did nothing to intervene based on Mr. Thompson's race.

### Thomas J. Sneed

119.    Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

120.    Thomas J. Sneed peace officer El Paso Police Department peace officer license date November 28, 2016, 7 years, 7 months

121.    Officer Sneed was present during the physical struggle with Michael Charles Thompson while he was being detained by law enforcement. Officer Sneed assisted in restraining Mr. Thompson during the struggle. Officer Sneed made the decision to deploy a taser on Thompson. Officer Sneed restrained Mr. Thompson with handcuffs. Instead of recognizing his serious medical needs, he dismissed Mr. Thompson as uncooperative and not complying with commands denying medical care. Officer Sneed did nothing for emergency medical needs after Thompson was found unresponsive in the patrol unit but identified he was not breathing. After Mr. Thompson became unresponsive, instead of providing care, Sneed conducted a warrant check on Thompson to justify the officers' conduct in the unlawful detainment and restraint. Officer Sneed participated in

providing information about the incident to a supervisor Sgt. Aguilera. Sneed was involved in the decision to issue an Emergency Detention Order (EDO) for Thompson after he was unresponsive in need of CPR and chose to pursue warrants for resisting arrest after the incident.

***FMS***

122.    Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

123.    El Paso Fire Department emergency medical services (FMS) personnel on Pumper 12 arrived on the scene in time to witness the arrest but did nothing to intervene or attempt to provide adequate medical care for his serious medical needs, namely CPR.

124.    FMS personnel were on the scene also claiming to have checked Thompson's vitals which they noted to be normal but also claimed they had difficulty getting his vitals. They provided no immediate care after he went limp.

125.    FMS personnel began CPR and requested a rescue unit to transport Thompson to the hospital

126.    El Paso Fire Department emergency medical services transported Mr. Thomspon to the University Medical Center by El Paso Fire Department emergency medical services.

127.    The hospital notes he arrived at 1:36 am.

128.    It further noted "The patient is a 36-year-old male who presented to the emergency department in cardiac arrest.

129.    Apparently he had an altercation with the police and was tased one time as well as hit in the leg four times with some other type of instrument to help subdue him.

130.    He was handcuffed while in need of medical care at the hospital.

131.    The records further note "36 yo man…presents via EMS after witnessing arrest."

132.    "...According to an EMS report, the patient reportedly had been in an altercation with Police in which he was tased *repeatedly*. Shortly thereafter, the patient then became unresponsive. Narcan

was administered by EPPD."

133.    He was pronounced dead at 1:47 am by Dr. Patek.

134.    Mr. Thompson's cause of death was determined as restraint asphyxia, use of taser deployment(s), and multiple force blunt force trauma with complications.

**The manner of death was determined to be homicide**

135.    Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

136.    Two different medical examiner's offices, including Dr. Janice Diaź-Cavalliery, M.D., policymaker for El Paso County Medical Examiner's office.

137.    The mechanism of death is positional-mechanical asphyxiation, electro-muscular excitation, and lack of provision of any basic medical aid and multiple blunt force trauma according to pathologist, Dr. Matthias I. Okoye, M.D..

138.    The Travis County Medical Examiner determined Mr. Thompson's immediate cause of death as "sudden death during law enforcement subdual and restrain[]."

139.    Travis County Medical Examiner determined further found a 2 by 1.5 inch irregular, red abrasion

140.    The left temple and the left eyebrow have a linear abraded cut. The left frontal scalp has a couple of irregular red abrasions that measured about 1 inch.

141.    The right eyebrow has an irregular, red abrasion that measures 2 1/2 by 1 inch.

142.    There is subcapsular hemorrhage corresponding in location to the abrasions described above.

143.    The right back has a couple of 1/16 inch lesions located 2 % inch right of the midline and separated by 1/4 inch of c.

144.    Blunt Force Trauma of the head was determined in an independent autopsy to include extensive recent red-purple contusion with subcapsular hemorrhage involving the left side of the face (12.0 x 8.0 cm).

145.    Recent red-purple contusion of the left ear lobe (4.0 x 6.0 cm).

146.    Extensive and generalized acute subdural and subarachnoid hemorrhages involving the convexity and the base of the brain with focal hematoma formation.

147.    Blunt Force Trauma of the Trunk including recent contusion with acute hemorrhage involving the right posterior upper chest wall involving the right rib #1 through his rib #3 (8.0 x 6.0 cm).

148.    Extensive recent involving the left posterior upper chest wall involving the left #1 rib through the left #4 rib (4.0 x 8.0 cm).

149.    Extensive recent contusion with hemorrhage involving the right posterior lower chest and abdominal walls involving the right #9 through #12 ribs (12.0 x 8.0 cm).

150.    Extensive recent contusion of the left lower posterior chest and abdominal walls involving the left #9 through #12 ribs (10.0 x 6.0 cm).

151.    Extensive contusion with acute parenchymal hemorrhage of the liver. Recent contusions with acute subcutaneous tissue hemorrhages involving the left upper back (6.0 x 4.0 cm) and the left mid to lower back (6.0 x 4.0 cm).

152.    Blunt force trauma of the upper and lower extremities was determined in an independent autopsy, including extensive abraded and lacerated contusion with acute hemorrhage involving the back of the left hand (6.0 x 6.0 cm).

153.    Extensive abraded contusion with hemorrhage involving the back of the right hand (6.0 x 7.0 cm) Small abraded contusion with hemorrhage of the anterior aspect of the left knee (3.0 x 4.0 cm).

154.    Dr Cavalliery indicated that methamphetamines contributed to Mr. Thompson's cause of death only to the extent that it could have made his heart weaker.

155.    There was no indication it actually did cause his heart to become weaker, according to Dr. Diaź-Cavalliery, M.D., ; it was noted in the report to show the presence of the narcotic and not to indicate that he would have died without the actions of the officers based on any voluntary or involuntary ingestion of the methamphetamine.

156.    Dr. Cavalliery made it clear that without question his death was a result of the officers' actions, a homicide, not considering any legal defenses.

157.    Jesus Cobos peace officer Texas Tech police dept. peace officer license June 1, 2014.

## V. CAUSES OF ACTION

***Fourteenth Amendment Due Process and Fourth Amendment Unreasonable Seizure***

158.    Plaintiff incorporates by reference all preceding paragraphs contained herein. Defendants Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos are liable for Mr. Thompson for violating his Fourth Amendment Constitutional right to be free from unreasonable seizure, pursuant to 42 U.S.C. § 1983, based on the unlawful detention, use of unreasonable and excessive force, and delay and denial of medical care under the Fourth and Fourteenth Amendments..

159.    Defendants Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos violated Mr. Thompson's clearly established constitutional rights, and their conduct was objectively unreasonable in light of clearly established law at the time of the relevant incident, as state actors, while acting under the color of state law.

160.     Additionally, Officers Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos each participated and watched while the unconstitutional use of force occurred by the other Officer.

161.     He did nothing to intervene, although he had the opportunity when Guerrero first grabbed Mr. Thompson, and upon arrival, officers Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos joined in either holding Mr. Thompson down; or failing to intervene to stop the unreasonable striking, choking and slamming Mr. Thompson to the ground, and taser causing the death of Michael Thompson.

### *Monell Claims and Individual Claims against The City of El Paso, its Chief, and City Council as policymakers*

162.     Plaintiff incorporates by reference all paragraphs contained herein.

163.     The El Paso Police Department Chief Allen is a state actor and the relevant policymaker for The City of El Paso, as the chief of police.

164.     Chief Allen (now deceased), in his capacity as head of the EPPD, had an integral role in developing and implementing EPPD procedures for responding to situations involving the mentally ill; investigating EPPD officer misconduct and determining appropriate discipline; and developing the scope and content of EPPD officer training.

165.     Mr. Thompson's right to be free from unreasonable seizure was violated because The City of El Paso, and the City Council as policymakers delegated the policy-making authority to its Chief. Chief Allen promoted, adopted, and promulgated a policy or custom of allowing his arresting Officer to wrongfully arrest citizens such as Mr. Thompson without a proper investigation or probable cause EEPD has a practice of warrantless mental health arrests without authority or probable cause.

166.    Failure to institute adequate training procedures to ensure officers employ appropriate tactics when dealing with persons suspected of suffering from mental illness and chose not to implement adequate training when faced with an individual suffering from a mental illness episode.

167.    This was the case with Mr. Salas-Sanchez,  resulting in his death, which was also at the hands of the untrained, undisciplined SPPD officers.

168.    The EPPD did not adequately ensure that officers utilized suitable tactics when engaging with individuals believed to be experiencing mental health crises.

169.    The City of El Paso failed to train its officers who responded to the scene here on the constitutional limits of the requirements for officers to establish probable cause that an individual poses a significant risk of serious harm to himself or others to support an emergency detention in violation of the Fourth Amendment.

170.    Mr. Thompson was in need of serious medical care. He was aware and asked for help for himself.

171.    EPPD defendant officers responded and detained him.

172.    Officers failed to evaluate whether he was a threat of harm to himself, a threat of harm to others, to support an emergency mental health detainment

173.    His mental illness did not cause a substantial risk of serious harm to others; Officers cannot detail in any way or provide facts to show there was a need to immediately restrain Mr. Thompson to prevent harm to himself either.

174.    There was sufficient time to get the medical care he requested or obtain a warrant if it was necessary before taking Mr. Thompson into custody.

175.    The El Paso police department's written policy in place and lack of training at the time of Micahel Thompson's death sanctioned the warrantless emergency detention of a mentally ill individual without probable cause.

176.    It further allows detention without a threat of imminent risk of harm to anyone as required by law.

177.    The El Paso Police Department's emergency detention policy failed to limit authorization of warrantless emergency detention of a mentally ill individual who presents a substantial risk of imminent serious harm as required by the well-established law and the Texas Health and Safety Code.

178.    There is a lack of training on emergency detention that promotes unconstitutional conduct and the moving force behind the violation of Michael Thompson's constitutional rights based on the written policy for warrantless emergency detentions of a mentally ill individual.

179.    The City of El Paso police department and its Chief, Allen, were aware of the need for crisis intervention units, they exist but chose not to implement them in situations when they are necessary, like with Mr. Thompson.

180.    The City of El Paso police department does have crisis intervention training, but it does not have an adequate critical intervention team or program for responding to persons in mental health crises where uniformed officers with licensed mental health professionals respond to field officers' calls for assistance. El Paso officers are not required to employ appropriate de-escalation and communication tactics.

181.    The City of El Paso, its Chief, Greg Allen, and the City Council as policymakers violated Mr. Thompson's right to be free from unreasonable seizure because he promoted, adopted, and promulgated a policy or custom of allowing his arresting Officer to wrongfully arrest citizens based on his Officer' inadequate training and supervision.

182.    Officers used excessive force in the same manner it did against Michael Thompson as it did against another mentally ill person, Michael Sosa.

183.    El Paso Officers Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos and Guerrero deliberately or recklessly violated Mr. Thompson's civil rights under the color of state law through an unreasonable seizure against him.

184.    No probable cause existed to arrest Mr. Thompson, nor did the Officer conduct a proper investigation or gather any evidence to effectuate an arrest.

185.    Defendants were sufficiently aware that The City of El Paso and its Chief and City Council as policymakers' supervision and training policies were defective, incomplete, or routinely ignored by its Officer (at least to the extent that they facilitated, permitted, and encouraged the unreasonable seizure against Mr. Thompson and other individuals and provide adequate and obvious medical care)

186.    The City of El Paso and its Chief and City Council as policymakers are liable for enacting and enforcing policies, procedures, or customs of ignoring apparent constitutional violations, namely unreasonable seizures during illegal detention and arrests of innocent individuals not accused or suspected of any crimes.

187.    Mr. Thompson had a right to due process of the law.

188.    Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos violated Mr. Thompson's right to due process when he was arrested and detained for no reason or probable cause.

189.    There was never a report or conduct showing he was a harm to himself or others..

190.    Mr. Thompson had not committed a crime, had no weapons, nor had he been a threat of harm to the Officer or anyone else when Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos detained him.

191.    This unlawful arrest was a gross violation of Mr. Thompson's right not to have his liberty deprived without due process.

192.    The policy and practices, custom, and procedure, the failures to properly and adequately hire, train, instruct, monitor, supervise, evaluate, investigate and discipline and the unconstitutional orders, approvals, and tolerance of wrongful conduct of the City of El Paso were adopted with deliberate indifference to the constitutional rights of citizens and a moving force of the deprivations of Mr. Thompson's clearly established and well settled constitutional rights under the Fourth Amendment in violation of 42 U.S.C. § 1983.

193.    The illegal use of force against Michael Thompson was a foreseeable consequence of Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos's conduct.

194.    (A) EPPD maintains a policy or custom of excessive force by officers so common and widespread as to constitute a custom that fairly represents municipal policy; (B) EPPD maintains a policy or custom of officers' failure to avoid the use of deadly force against individuals when the officer is not at risk of imminent serious bodily injury or death; (C) EPPD maintains a policy or custom of the use of excessive force by officers when the officer is on notice of a victim's mental health problems that is so common and widespread as to constitute a custom that fairly represents municipal policy; (D) EPPD failed to properly train or supervise members of the El Paso Police Department, including Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos, not to use intermediate or deadly force against an individual who does not place the officer or another at risk of imminent serious bodily injury or death; (E) EPPD failed to properly train or supervise members of the El Paso Police Department,including Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos, on mental health issues and how to implement de-escalation and communication tactics during incidents where their officers have notice and knowledge that the person for whom they are called has a mental health issues; (F) EPPD failed to institute proper procedures to ensure that EPPD

officers use appropriate de-escalation and communication tactics in situations in which it is known that an unarmed resident has a mental illness; (G) EPPD failed to pursue criminal or disciplinary charges or support criminal or disciplinary action against officers, including Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, and Jesus Cobos, who have deprived citizens and residents of El Paso of their constitutional rights, EPPD's policy of excessive force applied to mentally ill individuals' EPPD's failure to institute proper procedures to ensure officers employ appropriate tactics when confronted with mental health issues; EPPD's policy of refusing to discipline EPPD officers involved in instances of excessive force; and EPPD's failure to train officers on responding to mental health crises.

195.    Chief Allen is a policymaker who can be charged with actual or constructive knowledge of the official policies or customs within the EPPD. The City of El Paso delegated policy-making authority and who would have actual or constructive knowledge of each alleged policy or custom that forms the basis of municipal liability for Mr. Thompson's death.

***Chief Kyle K. Bonath***

196.    Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

197.    Chief Kyle K. Bonath is a policymaker who can be charged with actual or constructive knowledge of the official policies or customs within the TTEPPD. Texas Tech El Paso Police Department delegated policy-making authority and who would have actual or constructive knowledge of each alleged policy or custom that forms the basis of municipal liability for Mr. Thompson's death.

198.    Medical records stated a 36 yo man with pumper 12 personnel █████████████ who presented via EMS after witnessing arrest.

199.    According to an EMS report, the patient reportedly had been in an altercation with Police in which he was tased repeatedly. Shortly thereafter, the patient then became unresponsive. Narcan was administered by EPPD.

200.    EPFD started resuscitation in the field and he had 20 minutes of maximal efforts at resuscitation before arrival. Upon arrival, the patient remains unresponsive and cannot provide any history. The EPFD waited 25 minutes to intervene.

***Failure to Train, Supervise, and Discipline The City of El Paso and its Police and Fire Chiefs, Texas Tech El Paso Police Department and City Council as policymakers***

201.    Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

202.     The defendants were deliberately indifferent to the need to supervise, train, investigate, and discipline its officers on the need to refrain from unreasonable use of force, unlawful detention, and recognize an individual developing life-threatening complications from a prolonged state of severe agitation.

203.    One of these complications is metabolic acidosis from a buildup of lactic acid, and the requirement to provide adequate medical care for a person's serious and obvious medical needs.

204.    There was a failure to supervise and correct the wrongful and illegal behavior of its agents, staff, officers, and employees; there was a culture of silence, concealment, and tolerance of such conduct, and there was a failure to train, resulting in unreasonable force, an unlawful detainment, and denial of medical care.

a.    The claims against Chief Allen and The City of El Paso do not respond to superior claims but rather are based on their involvement in implementing and promoting the unconstitutional practices within The City of El Paso police department.

b.    As stated above, the Chief of Police and Council's wrongful conduct of failing to train their officers on the constitutional limits involved in the use of excessive force in effectuating arrest, the

lawfulness of a detention, and the need to provide medical care for a serious medical need and avoid the homicides based on increased lactic acid resulted in the highly predictable consequence suffered by Michael Thompson and shows a sufficient causal connection exists between it and the constitutional violation suffered by Michael Thompson.

### *Denial and Delay in medical care by EPPD Police, EPFD Paramedics, TTEPPD personnel*

205.    Each of the Paragraphs in this complaint is incorporated as if restated fully herein.

206.    Fire medical services, The Pumper 12 medical personnel ███████████████(FMS) were inadequately trained by The City of El Paso to take the lead in situations when medical emergency intervention is necessary.

207.    They were on the scene, and knew Mt. Thompson had been tased, and stood by as they idly watched officers place Mr. Thompson in the back seat of Officer Guerrero's squad car restrained face down and in the prone position.

208.    The El Paso Fire and Medical Services Department mandates its personnel to abstain from rendering medical assistance to individuals who exhibit apparent and severe medical conditions, despite the absence of immediate danger to any individual until the EPPD personnel give them consent, establishing an informal and chaotic hierarchy, particularly in the context of medical care.

209.    FMS personnel were compelled to observe, alongside the law enforcement officers present, as Mr. Thompson exhibited signs of physical distress and failed to respond to the officers' commands. However, FMS personnel failed to provide medical care as they had not received authorization to proceed from the EPPD.

210.    FMS personnel failed to commence Cardiopulmonary Resuscitation (CPR) or any other life-preserving intervention until it was too late.

211.    Every officer and medical provider on the scene dismissed Mr. Thompson's medical distress and attributed it to passive resistance to prevent himself from being arrested for no crime at all.

212.    Officer Arias secured Mr. Thompson his lower extremities and subsequently requested assistance in positioning Mr. Thompson within the rear compartment of the patrol vehicle. Officer Spencer directed the Fire and Medical Services personnel to ascertain Mr. Thompson's respiratory status rather than passively observing his impending death.

213.    It was at that point FMS claimed that he had a pulse, but Officer Thomas Sneed did not notice Mr. Thompson's back rose as he breathed.

214.    Officer Sneed told FMS he did not believe Mr. Thompson was breathing. FMS did not start to perform CPR or take any other lifesaving measures.

215.    FMS failed to provide any emergency medical care from the time Mr. Thompson became unresponsive until officers had to ask them to then conduct a second pulse check on Mr. Thompson after asking officers to turn Mr. Thompson over.

216.    After the second pulse check, the FMS paramedic stated he did not feel a pulse this time, but FMS personnel did nothing, no CPR or other lifesaving measures were taken.

217.    They left Mr. Thompson in the back of the squad car. Officers Sneed and Arias took over, pulled Mr. Thompson out of the vehicle, and sat him in an upright seated position against Officer Sneed's right leg. Mr. Thompson was not breathing, his eyes were open and had bluing around his lips.

218.    After waiting around for a while, the paramedic from FMS used a small flashlight to see if Mr. Thompson's eyes would react to the light.

219.    Mr. Thompson was slumped against the outside of the squad car on the concrete, unresponsive and limp.

220.    FMS paramedics allowed Officer Thomas Sneed to step in and hold Mr. Thompson's eyelids open by hand, the FMS paramedic scanned his light over the pupils of Mr. Thompson and observed

his pupils to be static and not responding to light. Yet, no CPR or other lifesaving measures were taken by FMS.

221.    This was a big red flag, despite the obvious signs of medical distress, Mr. Thompson did not receive immediate medical assistance from either FMS or EPPD.

222.    Officer Guerrero stepped in and removed his handcuffs from Mr. Thompson. Arias also claimed to assist in taking Mr. Thompson's handcuffs off placing his hands to his side and standing over Mr. Thompson's feet.

223.    Instead of helping with lifesaving measures Arias performed a pat down search of Mr. Thompson.

224.    Arias searched Mr. Thompson's pant pockets, waistline, pant legs, and socks.

225.    It was at that point that FMS emergency medical providers began to conduct CPR on him and call for a rescue unit to arrive at the scene and begin further assessment and triage of Mr. Thompson.

226.    Officer Thomas Sneed and Officer Spencer administered Narcan since they did not fathom that Mr. Thompson was in any mental health or medical distress.

227.    In contradiction to the basis for detaining him based on his mental health concerns.

228.    The FMS paramedics The rescue unit then transported Mr. Thompson to the University Medical Center (UMC) for" assessment and possible treatment."

229.    Sgt. Jacqueline Aguilera was on the scene in response to the use of force reported. She did not investigate on any probable cause to detain Mr. Thompson, whether there was a need for emergency medical care once the use of force occurred or required her officers on the scene to.

230.    Sgt. Jacqueline Aguilera observed as the officers under her supervision struggled to place an unresponsive Mr. Thompson into the back of a patrol car.

29

231.    In her official report, she falsely claimed that Mr. Thompson was resisting arrest and refused to comply with officers' commands.

232.    However, she omitted the crucial detail, reported by other officers at the scene, that Mr. Thompson was unconscious, not breathing, had a weak pulse and his body was limp.

233.    Despite knowing that Mr. Thompson had been tased and was in medical distress, Sgt. Aguilera permitted, condoned, and failed to intervene when the officers she supervised positioned him face down in the back of the patrol car, further compromising his already labored breathing.

234.    According to Sgt. Aguilera while Mr. Thompson was lying face down, officers instructed him to sit up, but he allegedly refused to follow their verbal commands.

235.    She went on further to state that The subject still refused to obey the verbal commands from the officers ignoring his serious medical needs.

### *Failure to Train*

236.    Chief Bonath, Chief Allen, and the City of El Paso provided its officers with no training whatsoever on deferring to medical or allowing medical professionals to take the lead for issues related to individuals undergoing medical distress when available and not intervening. Further, Chief Bonath, Chief Allen, and the City of El Paso were deliberately indifferent to creating a policy to defer to medical or to allow medical professionals to take the lead for issues related to individuals undergoing medical distress when available

237.    Chief Bonath failed to train Jesus Cobos on his limits and conduct as an off-duty employee for Wal-Mart due to the failure to train Mr. Thompson's rights were violated.

### *Equal Protection*

238.    violated Plaintiff's constitutional rights by subjecting him to unlawful, unequal treatment on the basis of his race in violation of the Fourth and Fourteenth Amendment of the United States

Constitution. Defendants' conduct created discriminatory effect by targeting Mr. Thompson for police action based on his race and racial profiling.

*Negligence*

239.    Walmart was negligent. Walmart demonstrated negligence by not providing adequate supervision and training to its off-duty security officer, a member of the Texas Tech Police Department, regarding adherence to on-duty responsibilities and the avoidance of unwarranted surveillance or harassment of individuals. Cobo was working an approved extra job for Walmart located at 5631 Dyer St. El Paso, TX 79904 a property owned by Wal-Mart Real Estate Business and operated by Walmart, Inc.. Walmart did not provide any specific training or protocols for off-duty police officers employed in a security capacity at their establishment. There were no oversight provisions in place to supervise or monitor Cobos by Walmart or the Texas Tech police department ultimately left Cobos unsupervised while he was on the clock for Walmart. As he was on the clock he decided to leave the premises and begin to follow Mr. Thompson despite Mr. Thompson not being engaged in any crimes.

Walmart knew that Texas Tech would not provide any oversight of Cobos while he was working at Walmart he was not required to wear a body-worn camera although he was approved to wear his uniform yet Walmart still failed to supervise its workers. There were no Walmart-distributed body camera requirements, no training, rules, handbooks, or guidelines provided by Walmart to Cobo. There were no training, rules, handbooks, or guidelines provided by Texas Tech in working the extra job off-duty. Neither Walmart nor Texas Tech supervised Cobos to prevent him from stalking Mr. Thompson, who looked to detain him for any reason although he was on duty with Walmart and off-duty as an officer. Walmart's negligent training, hiring, and supervision were the proximate cause of the injuries suffered and death by Mr. Thompson.

Walmart had a duty to use ordinary care to ensure that its agent did not present a danger to Mr. Thompson. This duty includes the duty to protect Mr. Thompson, a duty to take whatever action is reasonably prudent to reduce or eliminate an unreasonable risk of harm and Wal-Mart knew or should have known of the unreasonable risk posed by Cobos' untrained conduct on the date which made the basis for this suit. His conduct was foreseeable Walmart had a duty to protect Mr. Thompson breached this duty. Cobos, acting within the scope of his employment, constituted a breach of the duty of ordinary care owed by Wal-Mart to Mr. Thompson. Wal-Mart knew or should have known that the officer needed to be trained but failed to do so. As a result of Wal-Mart's failures Mr. Thompson was further injured by Wal-Mart's agent, Cobos. Cobos' actions were within the scope of his employment with Wal-Mart. Accordingly, Defendant Wal- Mart vicariously liable for the acts of Cabos for the causes of action above.Wal-Mart as principal, is liable for all torts committed by its agent in the scope of his employment, including those of Defendant Jesus Cobos. Walmart had a duty to exercise the degree of care that a reasonably careful person would use to avoid harm to others under as the facts described herein. Mr. Thompson injuries were proximately caused by Walmart's negligence, carelessness and reckless disregard of said duty and were negligent in failing to use ordinary care in hiring, supervising, training and retaining employees..The negligent, careless and reckless disregard of duty of Wal-Mart of at minimum failing to use reasonable care in hiring employees, ordinary care in supervising its employees, reasonable care in retaining its employees, and reasonable care in training its employees, jointly and severally, separately and collectively was the proximate cause of Plaintiff's injuries and damages. Wal-Mart further failed to train its agent to refrain from exercising in discrimination the moving force behind Cobos' actions on the date of the incident a violation of 42 USC 1981. Walmart additionally worked to conspire to obstruct justice by concealing the information related to the death of Michael Thompson along with the government defendants 42 USC 1985.

*Assault and Battery*

240.    Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, Jesus Cobos, Sgt. Aguilera and FMS's personal actions were ultra vires in furtherance of their own personal gains and actions based on their independent course of conduct to further their unlawful purposes and not serve any purpose of the municipality. The ultra vires acts of Officer Dominic Guerrero, Thomas Sneed, John Spencer, Michael Arias, Alonzo Martinez, Jesus Cobos, Sgt. Aguilera, and FMS personnel, which makes them liable for state law claims in their individual capacities, in the event The City of El Paso admits or concludes the officer's actions were not within the course and scope of his official duty and fails to adopt or ratify the individual officer's unconstitutional actions. The battery caused the death of Michael Thompson. If the evidence arises that officers' actions were not condoned or ratified by The City of El Paso and Texas Tech the officers' conduct was in furtherance of the individual defendants' personal gains and actions based on the defendant's independent course of conduct to further their own criminal or unlawful purposes and not serve any purpose of Texas Tech or the City of El Paso.

## DAMAGES

241.    The plaintiff seeks all damages allowed by law as a result of the aforementioned forming the basis for each of his causes of action.

242.    The plaintiff requests damages within the jurisdictional limits of the Court including:

a. Physical pain and mental anguish;

b. Loss of earning capacity and lost wages;

c. Disfigurement;

d. Physical impairment;

e. Medical care expenses;

f. Out-of-pocket economic losses.

g. other expenses related to the detention of Michael Thompson; and

h. exemplary/punitive damages.

i. Plaintiff's reasonable and necessary attorneys' fees;

j. Costs of court;

k. Pre-judgment and post-judgment interest at the highest rates allowable by law;

j. Injunctive relief against Defendants barring the use of excited delirium description, a non-medical term, and taser guns in non-threatening situations; and

l. For such other and further relief, both general and special, at law and in equity, to which Plaintiff may show himself entitled.

243.    The damages sustained by Plaintiff were approximately caused by the Defendants as set forth herein.

244.    Plaintiff respectfully requests the Court and jury to determine the amount of the loss Plaintiff has incurred in the past and will incur in the future.

245.    There are certain elements of damages provided by law that Plaintiff is entitled to have the jury in this case separately consider determining the sum of money for each element that will fairly and reasonably compensate Plaintiff.

## VII. ATTORNEY FEES

246.    After prevailing herein, Plaintiff is entitled to recover reasonable and necessary attorneys' fees and costs to enforce his constitutional rights under 42 U.S.C. § 1983 and 1988 from Defendants.

## VIII. TOLLING

247.    The minors' claims are tolled until they reach the age of majority and fraudulent concealment of the identity and facts of the events.

## IV. PRAYER

248.     Plaintiff prays that he has a judgment against Defendants for actual damages shown and proven at trial, for prejudgment, post-judgment interest, for costs of court, and for all other relief, legal and equitable, to which he is entitled.

>Respectfully submitted,
>By: /s/U.A. Lewis
>Lewis Lewis Law Group, PLLC.
>U.A. Lewis
>Texas Bar No. 24076511
>PO BOX 27353 Houston, TX 77227
>T(713) 570-6555
>F (713) 581-1017
>Attorney for Plaintiff
>myattorneyatlaw@gmail.com
>/s/Milad Farah
>Farah Law Group, PLLC.
>Milad Farah
>SBN: 24055466
>1231 E. Missouri
>El Paso TX 79902
>Phone: 915-533-0880
>Fax: 915-533-1155

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and the foregoing document has been duly sent to all counsel of record in this case by email, e-service, and/or facsimile on October 7, 2024.

**/s/U.A. Lewis**
**U.A. Lewis**